Savvas S. Diacosavvas
Darren H. Lubetzky
Federal Trade Commission
Northeast Region
One Bowling Green, Suite 318
New York, NY 10004
Tel: (212) 607-2809
Fax: (212) 607-2822
Email: sdiacosavvas@ftc.gov
Email: dlubetzky@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | **Case No.  19-cv-00063 (CW)** |
| v. | |
| FAT GIRAFFE MARKETING GROUP LLC, a Utah limited liability company, | |
| CLOUD CLICK, L.L.C., a Utah limited liability company, | **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |
| ELEVATE CONSULTING INTERNATIONAL LLC, a Utah limited liability company, | |
| COVE SOLUTIONS LLC, a Utah limited liability company, | |
| LAKE VIEW HOLDINGS LLC, a Utah limited liability company, | |
| GREGORY W. ANDERSON, individually and as a principal and sole owner of COVE SOLUTIONS LLC and LAKE VIEW HOLDINGS LLC, and | |

1

> GARRETT P. ROBINS, individually and as a
> principal and sole owner of FAT GIRAFFE
> MARKETING GROUP LLC, ELEVATE
> CONSULTING INTERNATIONAL LLC, and
> CLOUD CLICK, L.L.C.,
>
>      Defendants.

Plaintiff, the Federal Trade Commission ("FTC" or "the Commission"), for its Complaint alleges:

## SUMMARY OF THE CASE

1.      Defendants marketed and sold a purported moneymaking opportunity to consumers nationwide, claiming that consumers who paid an up-front fee, of typically $97, could make significant income with little effort working from home.   Consumers joining this program were told they would be paid for posting advertising links onto websites.   What they received was some basic training material but no advertising links to post or any other work to perform. Defendants also tricked their customers into calling various telemarketing sales floors marketing purported one-on-one business coaching packages costing thousands of dollars.   In perpetuating their scheme, Defendants violated the Federal Trade Commission Act ("FTC Act"), the FTC's trade regulation rule entitled Disclosure Requirements and Prohibitions Concerning Business Opportunities ("Business Opportunity Rule"), and the FTC's trade regulation rule entitled Telemarketing Sales Rule ("TSR").

2.      Plaintiff FTC brings this action under Sections 5(a), 13(b), and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain permanent injunctive relief,

rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of

ill-gotten monies, and other equitable relief for Defendants' violation of Section 5(a) of the FTC

Act, 15 U.S.C. § 45(a), the Business Opportunity Rule, 16 C.F.R. Part 437, as amended, and the

TSR, 16 C.F.R. Part 310.   The amended Business Opportunity Rule became effective on March

1, 2012 and has since that date remained in full force and effect.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 53(b), 57b, 6102(c), and 6105(b).   This action

arises under 15 U.S.C. § 45(a)(1).

4.      Venue is proper in the United States District Court for the District of Utah

pursuant to 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), (c)(2), and 15 U.S.C. § 53(b).

## PLAINTIFF

5.      Plaintiff, the Federal Trade Commission, is an independent agency of the United

States government created by statute.   15 U.S.C. §§ 41-58.   The Commission is charged with

enforcement of, among other things, Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which

prohibits unfair or deceptive acts or practices in or affecting commerce.   The Commission also

enforces the Business Opportunity Rule, 16 C.F.R. Part 437, as amended, which requires specific

disclosures and prohibits certain misrepresentations in connection with the sale of a business

opportunity.   Pursuant to the Telemarketing Act, the Commission promulgated and enforces the

TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

6.      The Commission is authorized to initiate federal district court proceedings, in its

own name by its designated attorneys, to enjoin violations of the FTC Act, the Business

Opportunity Rule, and the TSR and to secure such equitable relief as may be appropriate in each

case, including rescission or reformation of contracts, restitution, the refund of monies paid, and

the disgorgement of ill-gotten monies.   15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b,

6105(b), 16 C.F.R. Part 437, as amended, and 16 C.F.R. Part 310.

## DEFENDANTS

7.      Defendant Fat Giraffe Marketing Group LLC ("Fat Giraffe") is a Utah limited

liability company with its principal place of business in Bluffdale, Utah.   Defendant Fat Giraffe

was a seller who offered for sale, sold, and promoted business opportunities to consumers.

Defendant Fat Giraffe has transacted business in the District of Utah and throughout the United

States.   At times material to this Complaint, acting alone or in concert with others, Fat Giraffe

has advertised, marketed, distributed, or sold business opportunities to consumers throughout the

United States.

8.      Defendant Cloud Click, L.L.C. ("Cloud Click") is a Utah limited liability

company with its principal place of business in Bluffdale, Utah.   Defendant Cloud Click was a

seller who offered for sale, sold, and promoted business opportunities to consumers.   Defendant

Cloud Click has transacted business in the District of Utah and throughout the United States.   At

times material to this Complaint, acting alone or in concert with others, Defendant Cloud Click

has advertised, marketed, distributed, or sold business opportunities to consumers throughout the

United States.

9.      Defendant Elevate Consulting International LLC ("Elevate") is a Utah limited

liability company with its principal place of business in Bluffdale, Utah.   Defendant Elevate was

a seller who offered for sale, sold, and promoted business opportunities to consumers.

4

Defendant Elevate has transacted business in the District of Utah and throughout the United States.   At times material to this Complaint, acting alone or in concert with others, Elevate has advertised, marketed, distributed, or sold business opportunities to consumers throughout the United States.

10.     Defendant Cove Solutions LLC ("Cove") is a Utah limited liability company with its principal place of business in South Jordan, Utah.   Defendant Cove was a seller who offered for sale, sold, and promoted business opportunities to consumers.   Defendant Cove has transacted business in the District of Utah and throughout the United States.   At times material to this Complaint, acting alone or in concert with others, Cove has advertised, marketed, distributed, or sold business opportunities to consumers throughout the United States.

11.     Defendant Lake View Holdings LLC ("Lake View") is a Utah limited liability company with its principal place of business in South Jordan, Utah.   Defendant Lake View was a seller who offered for sale, sold, and promoted business opportunities to consumers. Defendant Lake View has transacted business in the District of Utah and throughout the United States.   At times material to this Complaint, acting alone or in concert with others, Lake View has advertised, marketed, distributed, or sold business opportunities to consumers throughout the United States.

12.     Individual Defendant Gregory W. Anderson ("Anderson") is the principal and sole owner of Defendant Cove and Defendant Lake View.   At all times material to this Complaint, acting alone or in concert with others, Individual Defendant Anderson has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendant Cove and Defendant Lake View, including the acts and practice set forth

in this Complaint.   Individual Defendant Anderson resides in this district and, in connection

with the matters alleged herein, has transacted business in this district and throughout the United

States.

13.     Individual Defendant Garrett P. Robins ("Robins") is the principal and sole owner

of Defendant Fat Giraffe, Defendant Cloud Click, and Defendant Elevate.   At all times material

to this Complaint, acting alone or in concert with others, Individual Defendant Robins has

formulated, directed, controlled, had the authority to control, or participated in the acts and

practices of Defendant Fat Giraffe, Defendant Cloud Click, and Defendant Elevate including the

acts and practice set forth in this Complaint.   Individual Defendant Robins resides in this district

and, in connection with the matters alleged herein, has transacted business in this district and

throughout the United States.

<u>**COMMON ENTERPRISE**</u>

14.     Defendants Fat Giraffe, Cloud Click, Elevate, Cove, and Lake View (collectively,

"Corporate Defendants," and together with Anderson and Robins, "Defendants") have operated

and functioned as a common enterprise while engaging in the deceptive acts and practices and

other violations of law alleged in this Complaint.   The Corporate Defendants have conducted the

business practices described below through an interrelated network of companies that have

common ownership, management, customer databases, web servers, products, and office

locations.   The Corporate Defendants commingled funds and relied on shared financial and

marketing services.

15.     Anderson and Robins operated a unified business through the Corporate

Defendants as equal partners.   Anderson formed Cove and Lake View, and Robins formed Fat

Giraffe, Cloud Click, and Elevate.   Among other things, Anderson managed the technical aspects of the business including website and software operations, and Robins managed the business's relationships with other parties including advertisers.

16.     Cove and Lake View use Anderson's residence in South Jordan, Utah as their place of business.   Fat Giraffe, Cloud Click, and Elevate use Robins's residence in Bluffdale, Utah as their place of business.

17.     Each Corporate Defendant maintained multiple merchant accounts used to sell purported business opportunities in furtherance of the enterprise.   A "merchant account" is a type of account that allows a business to receive payments from customers by credit card.   A merchant account is linked to a depository bank account.   When a consumer makes a purchase and pays by credit card, that purchase transaction is processed through the seller's merchant account, and then the sale proceeds are deposited into the seller's depository bank account.

18.     Anderson opened and maintained merchant accounts in the name of Cove and Lake View used to process payments from consumers in furtherance of the enterprise.

19.     Robins opened and maintained merchant accounts in the name of Fat Giraffe, Cloud Click, and Elevate used to process payments from consumers in furtherance of the enterprise.

20.     Each Corporate Defendant maintained multiple depository bank accounts used in furtherance of the enterprise, including, among other things, to receive payments from consumers after those payments were processed through a merchant account.

21.     Anderson opened and controlled multiple depository bank accounts in the name of Cove and Lake View that were used in furtherance of the enterprise, including, among other

things, to receive payments from consumers.

22.     Robins opened and controlled multiple depository bank accounts in the name of Fat Giraffe, Cloud Click, and Elevate that were used in furtherance of the enterprise, including, among other things, to receive payments from consumers.

23.     Anderson and Robins transferred millions of dollars among the five Corporate Defendants collectively.

24.     Anderson registered website domains in the name of Fat Giraffe, Cove, and Lake View used to market and sell business opportunities in furtherance of the enterprise.   The domains that Anderson registered included, among others: todays-online-review.com, consumers-trend-today.com, review-online-today.com, online-reviews-today.com, securebusinesssites.com, securedpaymentsite.com, and cashfromhomemembers.com.

25.     Robins contracted with advertising entities through Fat Giraffe to market purported business opportunities on behalf of the enterprise.

26.     Because the Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices described in this Complaint. Individual Defendant Anderson and Individual Defendant Robins have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## **COMMERCE**

27.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act.

## DEFENDANTS' BUSINESS ACTIVITIES

28.     Since at least 2014 and continuing through 2017, Defendants marketed and sold a purported moneymaking opportunity to consumers nationwide, claiming that consumers who paid an up-front fee could make significant income with little effort, all from the comfort of their own homes.   Consumers joining this program were told they would be paid for posting advertising links onto websites.   Defendants took in several million dollars from consumers who paid to join their bogus program.   Defendants took in millions more by assisting various telemarketing sales floors marketing purported one-on-one business coaching packages costing thousands of dollars to many of those same consumers.

29.     Defendants rebranded their work-at-home link-posting program over time, using names including, among others, Excel Cash Flow, Online Cash Commission, and, most recently, Cash From Home (collectively, the "Cash From Home Program").

30.     Defendants sold the Cash From Home Program over the Internet using websites that they maintained.   Defendants also hired others to market the Cash From Home Program online on their behalf and to direct consumers to the Defendants' websites.

### The Defendants Paid Affiliate Networks To Help
### Market Their Moneymaking Opportunity

31.     Defendants paid entities known as "affiliate networks" to market the Cash From Home Program and to attract consumers to the Defendants' websites.

32.     The affiliate networks contracted with entities and individuals known as "affiliate marketers" who disseminated advertisements for the Defendants' program over the Internet. Among other things, the affiliate networks coordinated the Defendants' marketing needs with the affiliate marketers' advertising activities.

33.     The advertisements disseminated by the affiliate marketers contained hyperlinks. Consumers who viewed one of these advertisements and clicked on the included hyperlink were directed to the Defendants' websites.   (Some consumers also arrived at Defendants' websites after conducting online searches for work-at-home business opportunities.)

34.     Using cookies and numerical codes embedded within these hyperlinks, the affiliate networks tracked which affiliate marketer attracted purchasers to the Defendants' websites.   Each time a consumer purchased the Cash From Home Program, the Defendants paid a predetermined fee to the affiliate network.   The affiliate network retained a portion of that fee for its own services and paid a portion to the particular affiliate marketer who disseminated the advertisement that attracted that consumer to the Defendants' websites.

35.     Defendants paid affiliate networks millions of dollars to market the Cash From Home Program to consumers nationwide.   Tens of thousands of those consumers then paid to join the Cash From Home Program.

## The Defendants Used Fake Review Websites To Help Market Their Moneymaking Opportunity

36.     The Defendants maintained two types of websites to sell their Cash From Home Program, so-called "presale" websites and so-called "direct" sales websites.

37.     The design of the Defendants' presale websites resembled that of an online blog or article reporting about the Cash From Home Program from the perspective of an independent reviewer.   They included logos of news organizations like NBC News, BBC, and USA Today. The following is an excerpt from a typical presale website:



38.     The Defendants' presale webpages purported to tell the story of a participant in

the Cash From Home Program making thousands of dollars monthly working part-time from her

home.   The story was followed by a comments section from prior program participants discussing their experiences with the Cash From Home Program, some purporting to discuss their earnings.

39.     Toward the end of the story, the presale pages claimed: "There are plenty of scams on the Internet claiming you can make $50,000 a month, but that is exactly what they are, scams.   This system, however, is not definitely not [sic] one of those!"

40.     In fact, the presale pages were not created by independent reporters or reviewers evaluating the Cash From Home Program.   The presale pages were maintained by the Defendants themselves.

41.     The success stories and testimonials about the Cash From Home Program on the presale pages were false.   The people featured were not real customers.

42.     The presale websites contained hyperlinks.   Consumers who clicked those links were taken to one of the Defendants' "direct" sales websites.

**The Defendants' Direct Sales Websites Misrepresented Their Work-At-Home Program as an Easy, Guaranteed Moneymaking Opportunity**

43.     The Defendants' direct sales websites were comprised of a sequence of webpages, beginning with a so-called "opt-in" page.

44.     The opt-in page claimed that the Cash From Home Program had been featured on news outlets like Fox News, CNN, and USA Today and invited consumers to enter their name and contact information in order to see whether there were any available openings in the program.   The following is an example of a typical opt-in page:



45.     Once consumers submitted their contact information, they then were taken to a

so-called "long form sales page."   The long form sales page began by claiming that the Cash

From Home Program had been featured on news outlets like Fox News, CNN, and USA Today,

that there were positions available in the consumer's area, and that consumers were guaranteed

to make hundreds of dollars daily by working just one hour each day.   The following is an

excerpt from a typical example of the beginning of a long form sales page:

13



46.     The long form sales page then presented a sales pitch for the Cash From Home

Program in the form of a success story by a single mother – named Cynthia Sprinter, in the

above example – who had lost her job but then joined the Defendants' program and became a

millionaire.

47.     The long form sales page described the Cash From Home Program by claiming

that the consumer's job would be to post advertising links onto websites and that consumers who

join would be given an online account that would be updated regularly with links to post.   The

following is an excerpt from a typical example of a long form sales page:





48.   The long form sales page claimed that: "the average amount you make per link

posted is $15."

49.   The long form sales page claimed that consumers can earn $225 by posting links

for just one hour.

50.   The long form sales page claimed that consumers can earn $58,500 annually, if

they spend just one hour each weekday posting these links.

51.   The long form sales page described the following methodology for consumers to

calculate their earnings:   "[I]f you post one link every 4 minutes, and you do that for 60 minutes,

that amounts to 15 links in just 60 minutes.   […]   Let's do the math: 15 links for $15 each equals $225.   That's $225 for 60 minutes of work!   If you do this five days a week, you can make $1125 a week… $4500 a month… and $58500 a year!   […]   And you can work as little or as much as you want!"

52.     The long form sales page claimed that consumers' "personal online accounts" would show their earnings in real time and displayed pictures of a large house, yacht, and fancy car.   The following is an excerpt from a typical long form sales page:



53.     The long form sales page also included shorter testimonials from others who had joined the Cash From Home Program and claimed they were making money.

54.     Consumers who decided to take part in the Cash From Home Program had to pay an up-front fee to join.   The typical fee was $97.

55.     After completing their online payment, consumers were shown a "thank you"

16

page.

56.     The thank you page presented consumers with their login credentials (a username and password) to access the Members' Area of the Defendants' website.   The thank you page also provided a link to the Members' Area.   The following is a typical example of a thank you page:



57.     The Defendants' description of what consumers would receive from the Cash From Home Program on the long form sales page was false and misleading.

17

58.     After paying to join, what consumers received was access to the Members' Area of the Cash From Home Program website.   The Members' Area did not supply consumers with advertising links to post or any other work to perform.   Defendants did not pay consumers for performing any work.

59.     Instead, the Members' Area included a handful of basic written and video tutorials about ecommerce services such as affiliate marketing and drop shipping.

60.     In order to perform any work, consumers would have to develop their own ecommerce businesses on their own.   For example, in order to begin link-posting, consumers would have to join third-party affiliate networks to receive advertising links and create a website or other online forum on which to post those links.

61.     Defendants' earnings representations are false and unsubstantiated.   Consumers who purchased the Cash From Home Program were unlikely to earn the income that Defendants claimed by posting links onto websites.   Defendants did not track whether or to what extent consumers who paid to join the Cash From Home Program made money.

62.     The success stories and testimonials appearing on the long form sales page were false.   The people featured were not real customers of Defendants.

### Defendants' Failure to Provide Disclosure and Earnings Claims Statements

63.     Among other things, the Business Opportunity Rule requires sellers to provide prospective purchasers with a written disclosure document disclosing certain specified categories of information.   Among other things, the Business Opportunity Rule also prohibits sellers from making earnings claims unless the seller furnishes an earnings claim statement to prospective purchasers providing certain specified information.

64.     Defendants failed to provide a written disclosure document to consumers prior to consumers' purchases of Defendants' purported work-at-home opportunity, as required by the Business Opportunity Rule.

65.     Although Defendants made claims to consumers about their likely earnings, they failed to provide consumers with an earnings claim statement as required by the Business Opportunity Rule.

## The Defendants Partnered With Telemarketers Selling Very Expensive Purported Business Coaching Packages

66.     The Defendants' deceptive marketing practices led to further financial loss even after consumers paid to join the Cash From Home Program.

67.     The Defendants used their sales pages and the Members' Area of their website to promote purported business coaching packages costing thousands of dollars.   They did so by inducing consumers to make a telephone call by misrepresenting the purpose of the call.

68.     For example, the long form sales page that consumers viewed before paying to join the Cash From Home Program claimed that the program included "A Free One-On-One Consultation With A [sic] Internet Wealth Expert!"

69.     The thank you page that consumers were shown immediately after paying to join the Cash From Home Program directed them to call a toll free number "to get your FREE One on One consultation with your start up specialist."

70.     When consumers who paid to join the Cash From Home Program logged into the Members' Area of the Defendants' website, they were shown colorful text and graphics directing them to "Call in to Talk to Your Startup Specialist!" and "to call our office and get in touch with

one of our startup experts in order to get an in-depth a [sic] personal assessment" and adding that they "could get started with the assistance of a Business Coach and achieve rapid results."

71.     When consumers logged into the Members' Area, a popup window also would appear displaying a video of a man dressed in a suit telling them to call the number shown in order to "register[] with one of our startup specialists."

72.     The following are examples of the Members' Area of the Defendants' website and an image from the video in the popup window:



73.     As these excerpts demonstrate, the "consultations" and "assistance [from] a Business Coach" were presented to consumers as part of the Cash From Home Program.

74.     Approximately 40 percent of consumers who purchased the Cash From Home Program called the telephone number as directed by Defendants.

75.     In fact, there were no startup specialists, startup experts, Internet wealth experts, or free one-on-one consultations.   The telephone number displayed on the thank you page and in the Members' Area that consumers were solicited to call would vary and belonged to one of several telemarketing sales floors working with the Defendants ("Telemarketing Floors").

When consumers dialed the number shown to them, they were routed to one of those Telemarketing Floors.

76.     Rather than provide guidance on link-posting, the Telemarketing Floors would attempt to sell those consumers expensive, one-on-one business coaching packages ("Business Coaching Packages") as upgrades to the Cash From Home Program.   In numerous instances, Telemarketing Floors falsely claimed that consumers who wanted to start a home-based Internet business and who purchased a Business Coaching Package would receive personalized guidance from expert coaches and were likely to earn substantial income.

77.     The Defendants also supplied the Telemarketing Floors with contact and transaction information about consumers who paid to join the Cash From Home Program, including consumers' names, addresses, IP addresses, email addresses, telephone numbers, purchase price, and purchase date.   Defendants gave Telemarketing Floors access to Defendants' customer database so that the Telemarketing Floors could see the contact and transaction information for the consumers allocated to them and utilize that information to help make a sale.

78.     Even though Defendants promoted the Business Coaching Packages and shared their customer information, Defendants did not investigate the terms of those packages or the services that were included.   Defendants also did not track whether or not consumers who purchased a Business Coaching Package from the Telemarketing Floors were able to make money or start a successful online business.

79.     The Defendants took in several million dollars by supplying their customer information to these Telemarketing Floors and helping to promote the Business Coaching

Packages that they sold.   The Telemarketing Floors paid Defendants on a per consumer basis

and, at times, prepaid Defendants for channeling consumers to them even before Defendants

acquired customers to refer.

80.      One of the Telemarketing Floors with which Defendants worked was a company

called Internet Teaching and Training Specialists, LLC ("ITT").   ITT alone paid the Defendants

almost $2 million for referring thousands of consumers who purchased the Cash From Home

Program.   The Business Coaching Packages that ITT sold those same consumers cost as much

as $15,800 or more.   The FTC sued ITT for engaging in deceptive telemarketing practices and

entered into a stipulated consent order with ITT and its principals earlier this year.   Complaint

for Permanent Injunction and Other Equitable Relief, *FTC v. Internet Teaching and Training*

*Specialists, LLC,* No. 17-cv-3407 (D. Nev. Dec. 12, 2017); Stipulated Order for Permanent

Injunction and Monetary Judgment, *FTC v. Internet Teaching and Training Specialists, LLC,*

No. 17-cv-3407 (D. Nev. Jan. 2, 2018).

81.      Defendants' assistance to the Telemarketing Floors was an integral and necessary

part of the Defendants' business model.   The Defendants took in almost twice as much money

from Telemarketing Floors paying for referrals as they did from consumers who paid to join the

Cash From Home Program.   The Defendants also paid affiliate networks for marketing services

millions of dollars more than they took in from consumers paying to join the Cash From Home

Program.   The Defendants' business could not exist without the relationships with and revenue

from the Telemarketing Floors.

### The Defendants Incurred High Levels Of
### Credit Card Chargebacks Indicative Of Fraud

82.      Credit card payment transactions can be reversed.   Consumers have the ability to

22

dispute charges that appear on their credit card bills by initiating what is known as a "chargeback" with their issuing bank.   The chargeback process is intended to protect consumers from improper and unauthorized charges to their credit cards.   When a chargeback occurs, the transaction at issue is reversed.   The reversal is processed through the seller's merchant account, and the money is debited from the seller's associated depository bank account and credited back to the consumer's credit card account.

83.     Anderson and Robins, as the authorized representatives on merchant accounts opened in the names of the various Corporate Defendants and used to process sales of the Cash From Home Program, each had access to account transaction records showing the Defendants' chargeback and refund activity.

84.     The Defendants' merchant accounts were linked to their depository bank accounts, and the account records for the depository bank accounts show periodic batch credit card payment deposits as well as chargeback debits.   Anderson and Robins each were signatories on these various company bank accounts and had access to account records showing these deposits and debits.

85.     Anderson and Robins each responded to inquiries by credit card processing entities in order to defend against chargebacks from dissatisfied consumers who paid to join the Cash From Home Program.

86.     The Defendants incurred chargeback rates of approximately 5% of sales.   A chargeback rate greater than 1% is generally considered excessive by the credit card associations.

87.     The Defendants also issued refunds at a rate of 35-40% of their sales.

88.     From 2014 through 2017, at least nine merchant accounts were shut down by

credit card processing entities due to high chargeback levels and return levels constituting

excessive risk, including multiple accounts maintained by Anderson and multiple accounts

maintained by Robins.

## VIOLATIONS OF THE FTC ACT

89.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts

or practices in or affecting commerce."

90.     Misrepresentations or deceptive omissions of material fact constitute deceptive

acts or practices prohibited by Section 5(a) of the FTC Act.

### Count One
### Misrepresentations Regarding Earnings

91.     In numerous instances in connection with the advertising, marketing, promotion,

offering for sale, or sale of the Cash From Home Program, Defendants have represented, directly

or indirectly, expressly or by implication, that consumers who purchase and use the Cash From

Home Program are likely to earn a specific level or range of actual or potential income.   Such

representations include:

      a.      "the average amount you make per link posted is $15."

      b.      "**EXPOSED:   Mom Makes $7,487/Month And You Won't Believe How She Does It!**"

      c.      "**If You Can Spare 60 Minutes A Day, We Can Offer You A Certified, Proven And Guaranteed Home Job To Make Up To $379/Day From Home!**"

92.     The representations set forth in Paragraph 91 above are false or misleading or

were not substantiated at the time the representations were made.

24

93.     Therefore, Defendants' representations as set forth in Paragraph 91 of this Complaint constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count Two**
**False Representations Regarding Service Provided**

94.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the Cash From Home Program, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who paid to join the Cash From Home Program:

        a.     would receive a job as a home-worker; and

        b.     would be supplied with advertising links to post online.

95.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 94 of this Complaint, consumers who paid to join the Cash From Home Program:

        a.     did not receive a job as a home-worker; and

        b.     were not supplied with advertising links.

96.     Therefore, Defendants' representations as set forth in Paragraph 94 of this Complaint are false and misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count Three**
**Misrepresentation Regarding Independent Reviews**

97.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the Cash From Home Program, Defendants have represented, directly

25

or indirectly, expressly or by implication, that favorable online endorsements of the Cash From Home Program reflected the independent opinions of impartial reviewers.

98.     In truth and in fact, favorable online endorsements of the Cash From Home Program did not reflect the independent opinions of impartial reviewers.

99.     Therefore, Defendants' representations as set forth in Paragraph 97 of this Complaint are false and misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE BUSINESS OPPORTUNITY RULE

100.    Defendants are "sellers" who have sold or offered to sell "business opportunities" as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(c) and (q).   Under the Business Opportunity Rule, a "seller" is a person who offers for sale or sells a business opportunity.   16 C.F.R. § 437.1(q).

101.    Under the Business Opportunity Rule, a "business opportunity" means a "commercial arrangement" in which a "seller solicits a prospective purchaser to enter into a new business;" the "prospective purchaser makes a required payment;" and the "seller, expressly or by implication, orally or in writing, represents that the seller or one or more designated persons will ... [p]rovide outlets, accounts, or customers, including, but not limited to, Internet outlets, accounts, or customers, for the purchaser's goods or services."   16 C.F.R. 437.l(c).

102.    Among other things, the Business Opportunity Rule requires sellers to provide prospective purchasers with a disclosure document in the form and using the language set forth in the Business Opportunity Rule and its Appendix A, and any required attachments.   In the disclosure document, the seller must disclose to prospective purchasers five categories of

information, including basic identifying information about the seller, any earnings claims the seller makes, the seller's litigation history, any cancellation and refund policy the seller offers, and contact information of prior purchasers.  16 C.F.R. § 437.3(a)(1)-(5).  Furthermore, this information must be disclosed at least seven (7) days before the prospective purchaser signs a contract or makes a payment.  16 C.F.R. § 437.2.  The pre-sale disclosure of this information enables a prospective purchaser to contact prior purchasers and take other steps to assess the potential risks involved in the purchase of the business opportunity.

103.    The Defendants have made earnings claims in connection with the sale of their business opportunities, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(f). Under the Business Opportunity Rule, an "earnings claim" means "any oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual or potential sales, or gross or net income or profits."  16 C.F.R. § 437.1(f).

104.    The Business Opportunity Rule prohibits sellers from making earnings claims unless the seller: (1) has a reasonable basis for the claim at the time it is made; (2) has in its possession written materials to substantiate the claim at the time it is made; (3) furnishes an Earnings Claim statement to prospective purchasers in conjunction with the disclosure document, containing, among other things, information regarding the time frame captured by the earnings claim, the characteristics of the purchasers, and the number and percentage of all persons who purchased the business opportunity within the timeframe who achieved at least the stated level of earnings; and (4) makes written substantiation of the earnings claim available to any prospective purchaser who requests it.  16 C.F.R. § 437.4(a).

105.    Defendants have also made earnings claims in connection with the sale of their business opportunities in the general media, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1 (h).   Under the Business Opportunity Rule, "general media" means "any instrumentality through which a person may communicate with the public, including, but not limited to, television, radio, print, Internet, billboard, Web site, commercial bulk email, and mobile communications."   16 C.F.R. § 437.l(h).

106.    The Business Opportunity Rule prohibits sellers from making earnings claims in the general media unless the seller has a reasonable basis for and written substantiation of any earnings claims and states in immediate conjunction with those claims the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all persons who purchased Defendants' business opportunity prior to that ending date who achieved at least the stated level of earnings.   16 C.F.R. § 437.4(b).

107.    Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Business Opportunity Rule constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

<u>Count Four</u>
**Disclosure Document Violations**

108.    In numerous instances in connection with the offer for sale, sale, or promotion of a business opportunity, Defendants have failed to furnish prospective purchasers with the disclosure document and attachments required by the Business Opportunity Rule, within the time period prescribed by the Rule.

109.    Defendants' acts and practices, as described in Paragraph 108 above, violate the Business Opportunity Rule, 16 C.F.R. §§ 437.2 and 437.3(a), and Section 5(a) of the FTC Act,

15 U.S.C. § 45(a).

## Count Five
### Earnings Claims Violations

110.     In numerous instances, Defendants have made earnings claims to prospective

purchasers in connection with the offering for sale, sale, or promotion of a business opportunity

while, among other things, (1) lacking a reasonable basis for the earnings claim at the time it was

made; (2) lacking written substantiation for the earnings claim at the time it was made; or (3)

failing to provide an earnings claim statement to the prospective purchaser, as required by the

Business Opportunity Rule.

111.     The Defendants' acts and practices, as described in Paragraph 110 above, violate

the Business Opportunity Rule, 16 C.F.R. § 437.4(a), and Section 5(a) of the FTC Act, 15 U.S.C.

§ 45(a).

## Count Six
### General Media Earnings Claims Violations

112.     In numerous instances, Defendants have made earnings claims in the general

media in connection with the offering for sale, sale, or promotion of a business opportunity

while, among other things, (1) lacking a reasonable basis for the earnings claim at the time it was

made; (2) lacking written substantiation for the earnings claim at the time it was made; or (3)

failing to state in immediate conjunction with those claims (i) the beginning and ending dates

when the represented earnings were achieved, and (ii) the number and percentage of all persons

who purchased Defendants' business opportunity prior to that ending date who achieved at least

the stated level of earnings.

113.     The Defendants' acts and practices, as described in Paragraph 112 above, violate

29

the Business Opportunity Rule, 16 C.F.R. § 437.4(b), and Section 5(a) of the FTC Act, 15 U.S.C.

§ 45(a).

### Count Seven
### Misrepresentations Regarding Income or Profits

114.    In numerous instances, in connection with the offer for sale, sale, or promotion of

a business opportunity, the Defendants, directly or indirectly, have misrepresented the amount of

sales, or gross or net income or profits a prospective purchaser may earn or that prior purchasers

have earned.

115.    The Defendants' acts and practices, as described in Paragraph 114 above, violate

the Business Opportunity Rule, 16 C.F.R. § 437.6(d), and Section 5(a) of the FTC Act, 15 U.S.C.

§ 45(a).

### Count Eight
### Misrepresentations

116.    In numerous instances, in connection with the offer for sale, sale, or promotion of

a business opportunity, the Defendants, directly or indirectly, have misrepresented the cost, or

the performance, efficacy, nature, or central characteristics of the business opportunity or the

goods or services offered to a prospective purchaser.

117.    The Defendants' acts and practices, as described in Paragraph 116 above, violate

the Business Opportunity Rule, 16 C.F.R. § 437.6(h), and Section 5(a) of the FTC Act, 15 U.S.C.

§ 45(a).

### VIOLATIONS OF THE TELEMARKETING SALES RULE

118.    Congress directed the FTC to prescribe rules prohibiting abusive and deceptive

telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, in

30

1994.   The FTC adopted the original Telemarketing Sales Rule ("TSR") in 1995, extensively amended it in 2003, and amended certain sections thereafter.

119.    The Telemarketing Floors selling Business Coaching Packages discussed in Paragraphs 66 through 81 above, including ITT, were "sellers" or "telemarketers" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

120.    The TSR prohibits sellers and telemarketers from "[m]isrepresenting, directly or by implication, in the sale of goods and services . . . [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer."   16 C.F.R. § 310.3(a)(2)(iii).

121.    The TSR prohibits sellers and telemarketers from "[m]aking a false or misleading statement to induce any person to pay for goods or services. . . ."   16 C.F.R. § 310.3(a)(4).

122.    The Business Coaching Packages are "Investment opportunit[ies]" as defined in the TSR, 16 C.F.R. § 310.2(s).   The TSR defines an "Investment opportunity" as "anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation."   16 C.F.R. § 310.2(s).

123.    The TSR prohibits sellers and telemarketers from "[m]isrepresenting, directly or by implication, in the sale of goods and services . . . [a]ny material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability."   16 C.F.R. § 310.3(a)(2)(vi).

124.    The TSR also prohibits a person from providing substantial assistance or support to any seller or telemarketer when that person "knows or consciously avoids knowing" that the

seller or telemarketer is engaged in acts or practices that violate Section 310.3(a). 16 C.F.R. §
310.3(b).

125.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and
Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an
unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the
FTC Act, 15 U.S.C. § 45(a).

## Count Nine
### Assisting and Facilitating Violations of the TSR

126.     In numerous instances, Defendants provided substantial assistance or support to
Telemarketing Floors when Defendants knew, or consciously avoided knowing, that the
Telemarketing Floors engaged in acts or practices that violate Sections 310.3(a)(2)(iii),
(a)(2)(vi), and (a)(4) of the TSR, as described in Paragraphs 66 through 81 above.

127.     Defendants' acts or practices, as described in Paragraph 126 above, are deceptive
telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(b).

## CONSUMER INJURY

128.     Consumers have suffered substantial injury as a result of Defendants' violations
of the FTC Act, Business Opportunity Rule, and TSR.   In addition, Defendants have been
unjustly enriched as a result of their unlawful acts or practices.   Absent injunctive relief by this
Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm
the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

129.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant
injunctive and such other relief as the Court may deem appropriate to halt and redress violations

of any provision of law enforced by the FTC.   The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

130.    Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the Business Opportunity Rule and the TSR, including the rescission or reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act, Business Opportunity Rule, and TSR by Defendants;

B.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, Business Opportunity Rule, and TSR, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.    Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated: 1/29/2019

Savvas S. Diacosavvas
Darren H. Lubetzky
Federal Trade Commission
Northeast Region
One Bowling Green, Suite 318
New York, NY 10004
Tel: (212) 607-2829
Fax: (212) 607-2822
Email: sdiacosavvas@ftc.gov
Email: dlubetzky@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION